J. Stephen Peek, Esq. (NV Bar No. 1758)
Robert J. Cassity, Esq. (NV Bar No. 9779)  HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada 89134
Tel: (702) 669-4600
Fax: (702) 669-4650
speek@hollandhart.com
bcassity@hollandhart.com

Sheila A. Sadighi, Esq. (*Pro Hac Vice forthcoming*)
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, NJ 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
ssadighi@lowenstein.com

*Attorneys for Plaintiffs Fir Tree, Capital Management LP
(f/k/a Fir Tree Inc.) d/b/a Fir Tree Partners*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| FIR TREE CAPITAL MANAGEMENT LP (f/k/a FIR TREE INC.) d/b/a FIR TREE PARTNERS,<br><br>Plaintiffs,<br><br>v.<br><br>COMPARTMENT IT2, LP, COMPARTMENT IT5, LP, COMPARTMENT IT9, LP, and MFAM MOBILFUNK ASSET MANAGEMENT GMBH<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT & JURY TRIAL DEMAND** |

Plaintiff Fir Tree Capital Management LP (f/k/a Fir Tree Inc.) d/b/a Fir Tree Partners ("FT" or "Plaintiff"), by and through its undersigned counsel, for its complaint against Defendants Compartment IT2, LP; Compartment IT5, LP; Compartment IT9, LP (together, the

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

"IT Funds"), and MfAM Mobilfunk Asset Management GmbH ("MfAM" and, collectively with the IT Funds, "Defendants"), alleges as follows:

## NATURE OF THIS ACTION

1.     Plaintiff is an SEC registered investment adviser and serves as investment manager of Fir Tree Capital Opportunity (LN) Master Fund, L.P. and Fir Tree Ref III Tower LLC (together, the "FT Funds," and collectively with FT, "Fir Tree").  The FT Funds are investment funds that in August, 2013 entered into a transaction (the "Financing") by which they agreed to provide $35 million in "rescue" financing to CIG Wireless, Inc. ("CIG" or the "Company"), a Nevada corporation that owned and operated wireless and broadcast communication towers.

2.     The Financing not only required the FT Funds to contribute $35 million to CIG in immediate capital, but also permitted CIG to call on the FT Funds to provide up to $25 million in additional capital – $9 million of which was in fact called by CIG and contributed by the FT Funds.

3.     In exchange for their capital, the terms of the Financing provided the FT Funds with "Series A" preferred stock with anti-dilution protection, a liquidation preference and premium in the event the Company was sold, and the right to appoint two members to CIG's five-member board, among other rights.

4.     At the time of the Financing, Defendants, the IT Funds, were common stockholders of CIG.   In connection with the Financing, Defendants executed an Acknowledgement and Consent (the "Consent"), in which they expressly, *inter alia*: (i) consented to, ratified, and approved in all respects the terms of the Financing, and all other transactions contemplated thereby, including the anti-dilution, liquidation preferences and other rights accorded the FT Funds as consideration for their receipt of up to $60 million in rescue financing; (ii) acknowledged and agreed that the terms of the Financing were fair and reasonable in all respects; (iii) agreed that the Consent constituted an estoppel by the IT Funds in favor of the FT

Funds; and (iv) acknowledged that their consent was needed in order to induce the FT Funds to consummate the Financing.

5.     Effective as of November 9, 2014, CIG adopted the "Amended and Restated Bylaws of CIG Wireless Corp" (the "Bylaws," a true and correct copy of which is attached hereto as Exhibit A.).  Paragraph XIII.02 of the Bylaws, titled "Fee Shifting," provides in relevant part that, in the event that any security holder of CIG (a "Claiming Party") who initiates or maintains any litigation against any Company Director or other security holder for *inter alia* breach of fiduciary duty, and "does not obtain a judgment on the merits with respect to such Claim that substantially achieves … the full remedy sought," then "each Claiming Party shall be obligated jointly and severally to reimburse … any such … Director … or security holder for all fees, costs, and expenses of every kind and description (including, but not limited to, all attorneys' fees and other litigation expenses) … incurred in connection with such Claim."

6.     In 2015, CIG was merged with an unaffiliated, third-party company.  As a direct result of the FT Funds' negotiated liquidation premiums and anti-dilution protection, which Defendants had explicitly approved in the Consent, the merger resulted in the FT Funds being paid first out of the merger proceeds—although not fully repaid—in accordance with their contractual liquidation preferences, and the common stockholders, including Defendants, the IT Funds, received no portion of the merger consideration.

7.     Unhappy that they received no consideration in the merger as a result of the contractually negotiated payment waterfall, which they approved in connection with the Financing, and notwithstanding the representations and estoppel contained in the Consent, Defendants filed suit against Plaintiff FT and CIG's former Directors in Florida (the "Florida Litigation") and then in Nevada (the "Nevada Litigation").

8.     The Florida Litigation was dismissed for improper venue.  More than one year later, Defendants filed the Nevada Litigation.  The United States District Court for the District of Nevada also dismissed Defendants' claims – at the motion to dismiss stage and before FT and the

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

other defendants were required to file any answer or counterclaims – finding *inter alia* that, to the extent Defendants alleged harm stemming from the Financing, they were estopped from asserting such claims by virtue of their Consent.

9.     Because Defendants failed to obtain a judgment on the merits in the Florida Litigation or in the Nevada Litigation that achieved the full remedy sought, Plaintiff brings this action to recover the fees and expenses incurred in defending itself, and as a result of certain indemnification agreements, former CIG directors, in those litigations.

## PARTIES

10.     Plaintiff Fir Tree Capital Management LP (f/k/a Fir Tree Inc.) d/b/a Fir Tree Partners is a Delaware limited partnership with its principal place of business in New York City, New York.

11.     Defendant Compartment IT2, LP is a Georgia limited partnership.

12.     Defendant Compartment IT5, LP is a Georgia limited partnership.

13.     Defendant Compartment IT9, LP is a Georgia limited partnership.

14.     Defendant MfAM is a German corporation.  MfAM is the Managing Director of the IAM US, LLC, which is the General Partner of each of the IT Funds.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that this is an action for damages in excess of $75,000.00, and there is complete diversity between the parties.

16.     This Court has personal jurisdiction over the Defendants because this claim arises under CIG's Bylaws, and as a result *inter alia* of the Nevada Litigation, which was brought by Defendants in Nevada pursuant to the Bylaws' exclusive forum provision for any claim regarding an alleged breach of fiduciary duty and for claims governed by the internal affairs doctrine.

17.     Venue is proper in this District based on the exclusive forum provision of CIG's Bylaws under which this claim arises.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4

**FACTS**

**A.    Defendants' Investment in CIG**

18.    CIG was an owner and operator of wireless and broadcast communication towers throughout the United States.  CIG generated revenue by leasing antenna space to wireless service providers.

19.    Defendants are sophisticated institutional investors based in Germany who made loans to a CIG subsidiary to finance the acquisition of tower assets.  By agreement dated June 30, 2012, Defendants, the IT Funds, and CIG entered into an agreement to restructure the IT Funds' loans as investments in the Company, such that the debt owed by the Company to the IT Funds would be eliminated and, in return, the interests of the IT Funds would convert into common stock, equity interests in CIG by no later than March 31, 2015.

**B.    The FT Funds' Rescue Financing**

20.    In 2013, CIG desperately needed a capital infusion.  Fir Tree agreed to provide the needed rescue financing, and CIG and the FT Funds entered into the Financing, pursuant to which the FT Funds infused $35 million into CIG in exchange for newly issued shares of CIG Series A-1 Preferred Stock, and Series A-2 Convertible Preferred Stock ("Series A-2 Preferred Stock").

21.    Under the terms of the Financing, payment of dividends and distribution of assets upon a liquidation event (*i.e.*, a sale of the Company), would be made pursuant to a payment waterfall.  The Series A-1 Preferred Stock would receive payment first, with the Series A-2 Preferred Stock junior to only the Series A-1 Preferred Stock, and with the Series B and the common stock (which Defendants, the IT Funds, owned) being junior to both the Series A-1 and A-2 Preferred Stock.  In other words, in the event of a merger, the Series B and common stockholders would receive a share of the merger consideration *only after* the Series A-1 and A-2 Preferred Stockholders received full value for their shares.  Both the Series A-1 and Series A-2 Preferred Stock were also entitled to liquidation premiums and anti-dilution protection.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

22.     The Financing further provided that CIG had the right to call additional financing of up to $25 million, which would entitle the FT Funds to a pre-determined number of additional preferred shares of CIG.

23.     Finally, under the terms of the Financing, the FT Funds were entitled to designate two members of CIG's five-member board.  The FT Funds designated Scott Troeller and Jarret Cohen, both Fir Tree executives at the time.

24.      In order to induce their investment in the Company, the FT Funds required that the IT Funds expressly consent to and ratify the terms of the Financing, including the anti-dilution provisions and liquidation preferences, which would have the effect of substantially diluting and subordinating the Defendant IT Funds' investments to the Plaintiff FT Funds' investments in the event of a sale of the Company.

25.     The Consent, which Defendants did execute and deliver, provided that:

Each of Compartment IT2, Compartment IT5 and Compartment IT9 hereby (a) consents to, ratifies, confirms, adopts and approves in all respects: (x) the Financing Transaction, and all related agreements to be executed in connection therewith, including, without limitation, the . . . Preferences and Rights of the Series A-1 Preferred Stock and Series A-2 Preferred Stock (collectively, the "Financing Documents"), and each of the transactions contemplated thereby, including, without limitation, the issuance of the Series A-1 Preferred Stock and Series A-2 Preferred Stock; . . . and (b) acknowledges and agrees that each of the Financing Documents, and the terms and conditions contained herein and therein, are fair and reasonable in all respects. . . .

Each of Compartment IT2, Compartment IT5 and Compartment IT9 acknowledges that this letter is being delivered in order to induce the Series A Investors to consummate the Financing Transaction.  Each of Compartment IT2, Compartment IT5 and Compartment IT9 represents and warrants that it . . . understands that the Series A Investors are relying upon this letter in consummating the Financing Transaction.

This letter and the consent and acknowledgment contained herein shall constitute an estoppel by each of Compartment IT2, Compartment IT5, Compartment IT9 and the General Partner for the benefit of . . . the Series A Investors, which may not be revoked at any time for any reason and which may be fully relied upon without exceptions or qualifications by each of . . . the Series A Investors. . . .

Each Series A Investor is an unqualified, express intended third party beneficiary of this letter and shall have the right to assert and enforce the provisions of this letter directly against Compartment IT2, Compartment IT5 or Compartment IT9….

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

(*See* Ex. B (Acknowledgement and Consent, Exhibit 10.44 to CIG Form 8-K (Aug. 1, 2013).)

26.     In December 2013 and March 2014, CIG drew down $9 million of the $25 million in additional financing that it was entitled to call upon from the FT Funds under the terms of the Financing.  Accordingly, pursuant to the terms of the Financing, the FT Funds received additional shares of Series A-1 Preferred Stock and Series A-2 Preferred Stock.

**C.     CIG's Bylaws**

27.     Effective as of November 9, 2014, CIG adopted its Bylaws, which contain the following fee-shifting provision:

> [If] (i) any current or former security holder of the Corporation … initiates, asserts, maintains or continues any litigation … ("Claim") against … any current or former Director, Officer or security holder … arising in whole or in part out of any Internal Matter (as defined below), and (ii) the Claimant does not obtain a judgment on the merits with respect to such Claim that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse … any such current or former Director, Officer or security holder for all fees, costs, and expenses of every kind and description (including, but not limited to, all attorneys' fees and other litigation expenses) that … any such current or former Director, Officer or security holder have incurred in connection with such Claim. For purposes of this Paragraph .02, the term "Internal Matter" shall mean and include: (i) any derivative action or proceeding brought on behalf of or in the right of the Corporation; (ii) any action asserting a claim of breach of a fiduciary duty owed by any Director, Officer or other employee of the Corporation to the Corporation or the Corporation's security holders; (iii) any action asserting a claim arising pursuant to any provision of applicable state law; (iv) any action asserting a claim arising pursuant to any provision of the federal securities laws, and any regulation promulgated pursuant thereto; or (v) any action asserting a claim governed by what is known as the internal affairs doctrine.

(*See* Ex. A, p.10.).

**D.     The Vertical Bridge Merger**

28.     On March 20, 2015, CIG finalized the terms of a merger with Vertical Bridge Acquisitions, LLC ("Vertical Bridge").  Vertical Bridge previously reached out to a non-Fir Tree CIG director, Paul McGinn, to express interest in potentially merging with CIG.  CIG's Board appointed a Special Committee, composed of independent directors Grant Barber and Gabriel

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Margent (non-employees of Fir Tree), to consider the proposed merger.  The Special Committee considered the options available to CIG, including two other bids it received, and ultimately recommended that the Board approve the merger with Vertical Bridge, which recommendation the Board accepted.  The FT Funds voted in favor of the merger.

29.     Vertical Bridge's final offer consisted of total consideration valued at $149 million.   As required by the terms of the Financing—to which the Defendants explicitly consented—the FT Funds were paid from the merger consideration first.  Because the merger consideration fell approximately $61.3 million short of the FT Funds' Series A liquidation preference, under the payment waterfall, the FT Funds were not fully repaid, and the Series B and common stockholders were not entitled to receive any portion of the merger consideration.

**D.     The Florida and Nevada Litigations**

30.     In contravention of the Consent that the Defendants signed in order to induce the FT Funds' investment, wherein they consented to, ratified, confirmed, adopted and approved the terms of the Financing "in all respects," Defendants filed suit against *inter alia* FT and the Fir Tree executives that were on the CIG board, Scott Troeller and Jarret Cohen, in Florida state court, asserting claims for breach of fiduciary duty and conversion.

31.     FT and the Board moved to dismiss for improper venue on grounds that CIG's Bylaws required the suit be brought in Nevada (CIG's state of incorporation) and for failure to state a claim.  On March 22, 2016, the Florida court granted FT's motion and dismissed the action for improper venue.

32.     Over a year later, on April 11, 2017, Defendants re-filed essentially the same suit in Nevada federal court, asserting claims for breach of fiduciary duty against FT and CIG's former directors for alleged breaches of fiduciary duty and/or aiding and abetting breaches of fiduciary duty.

33.     Following extensive briefing and oral argument before the Honorable Miranda Du, U.S.D.J., Defendants' complaint in the Nevada Litigation was dismissed without prejudice on

March 30, 2018, because, as the court found, Defendants' allegations did not "give rise to plausible direct claims" or any plausible direct claims were barred by "the terms of the Financing Agreement." (*See* Ex. C at 6).

34.     The Nevada court specifically found that Defendants "are estopped from asserting such claims [relating to the issuance of preferred stock to Fir Tree] by their consent to the Fir Tree Financing Agreement." (*Id.* at 9).   The court further noted that the actions underlying Defendants' allegations "were permitted by the Fir Tree Financing Agreement Plaintiffs ratified and cannot form the basis of Plaintiffs' claims." (*Id.*)

35.     Defendants lost at the motion to dismiss stage and thus clearly did not "obtain a judgment on the merits . . . that substantially achieves, in substance and amount, the full remedy sought."   Defendants are therefore obligated under CIG's bylaws to reimburse Plaintiff for all attorneys' fees and other litigation expenses incurred in connection with the Florida and Nevada lawsuits.

## COUNT I: FOR ATTORNEYS' FEES AND EXPENSES PURSUANT TO CIG'S BYLAWS

36.     Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

37.     The Bylaws, including but not limited to the Fee Shifting provision, are valid and enforceable against the Defendants in law and in equity because they were adopted for a proper corporate purpose.

38.     As security holders of CIG from prior to the effective date of the CIG Bylaws until the Vertical Bridge merger, Defendants are bound by the Bylaws, which were in effect at all times relevant to the claims and allegations asserted in the Florida Litigation and the Nevada Litigation.

39.     The Florida Litigation was dismissed for improper venue.   The Nevada Litigation was dismissed – before the defendants in that action filed any answer or counterclaims – for failure to state a claim.   In both cases, Defendants did not even come close to obtaining a favorable judgment on the merits, and indeed obtained no relief at all.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

40.     Under the clear terms of the Bylaws, Defendants are required to reimburse Plaintiff for all attorneys' fees, costs, and other expenses Plaintiff incurred directly or on behalf of the FT Funds and the CIG Directors in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants, as follows:

A.     Awarding actual damages to Plaintiff, in an amount to be proven at trial;

B.     Awarding Plaintiff pre- and post-judgment interest, and attorneys' fees and costs in connection with this action;

C.     Awarding Plaintiff such other and further relief as may be proven or as the Court deems appropriate.

DATED this 27th day of April, 2018

/s/ Robert J. Cassity
J. Stephen Peek, Esq. (NV Bar No. 1758)
Robert J. Cassity, Esq. (NV Bar No. 9779)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada 89134

Sheila A. Sadighi, Esq.
(*Pro Hac Vice forthcoming*)
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, NJ 07068

*Attorneys for Plaintiffs Fir Tree, Capital Management LP (f/k/a Fir Tree Inc.) d/b/a Fir Tree Partners*

10919579_1

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

# EXHIBIT A

Exhibit 3.1

## AMENDED AND RESTATED BYLAWS

### OF

### CIG WIRELESS CORP.

_____

*Adopted and Effective as of November 9, 2014*

**I.      SHAREHOLDER'S MEETING.**

**.01 Annual Meetings.**

The annual meeting of the shareholders of CIG Wireless Corp., a Nevada corporation (the "Corporation"), for the purpose of election of Directors and for such other business as may come before it, shall be held at the registered office of the Corporation, or such other places, either within or without the State of Nevada, as may be designated by the notice of the meeting, on such date and at such time as may be designated from time to time by the Board of Directors.

**.02 Special Meeting.**

Special meetings of the shareholders of the Corporation may be called at any time by the holders of twenty-five percent (25%) of the voting shares of the Corporation, or by the President, or by the Board of Directors or a majority thereof. Further, special meetings of the shareholders of the Corporation holding Series A-1 Preferred Stock or Series A-2 Preferred Stock may be called at any time by the holders of twenty-five percent (25%) of the voting shares of Series A-1 Non-Convertible Preferred Stock or Series A-2 Convertible Preferred Stock, respectively, or by the President, or by the Board of Directors or a majority thereof. No business shall be transacted at any special meeting of shareholders except as is specified in the notice calling for said meeting. The Board of Directors may designate any place, either within or without the State of Nevada, as the place of any special meeting called by the president or the Board of Directors, and special meetings called at the request of the shareholders shall be held at such place, either within or without the State of Nevada, as may be determined by the shareholders calling said meeting and, in each case, placed in the notice of such meeting.

**.03 Notice of Meeting.**

Written notice of annual or special meetings of shareholders stating the place, day, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called shall be given by the secretary or persons authorized to call the meeting to each shareholder of record entitled to vote at the meeting. Such notice shall be given not less than ten (10) nor more than sixty (60) days prior to the date of the meeting, and such notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at his/her address as it appears on the stock transfer books of the Corporation.

**.04 Waiver of Notice.**

Notice of the time, place, and purpose of any meeting may be waived in writing and will be waived by any shareholder by his/her attendance threat in person or by proxy. Any shareholder so waiving shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

**.05 Quorum and Adjourned Meetings.**

A majority of the outstanding shares of the Corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of shareholders. A majority of the shares represented at a meeting, even if less than a quorum, may adjourn the meeting from time to time without further notice. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

**.06 Proxies.**

At all meetings of shareholders, a shareholder may vote by proxy executed in writing by the shareholder or by his/her duly authorized attorney in fact. Such proxy shall be filed with the secretary of the Corporation before or at the time of the meeting. No proxy shall be valid after six (6) months from the date of its execution, unless otherwise provided in the proxy.

**.07 Voting of Shares.**

Except as otherwise provided in the Articles of Incorporation or in these Bylaws, every shareholder of record shall have the right at every shareholder's meeting to one (1) vote for every share standing in his/her name on the books of the Corporation, and the affirmative vote of a majority of the shares represented at a meeting and entitled to vote thereat shall be necessary for the adoption of a motion or for the determination of all questions and business which shall come before the meeting.

II.   **DIRECTORS.**

**.01 General Powers.**

The business and affairs of the Corporation shall be managed by its Board of Directors.

**.02 Number, Tenure and Qualifications.**

The number of Directors of the Corporation elected by voting at the annual meeting shall be not less than one nor more than thirteen with the exact number determined from time to time by resolution of the Board of Directors. In addition to the Directors elected at the annual meeting, the Board of Directors shall also contain those additional Directors elected pursuant to the Corporation's Certificate of Designation, Preferences and Rights of Series A-1 Non-Convertible Preferred Stock and Series A-2 Convertible Preferred Stock of CIG Wireless Corp. (the "Series A-1 & Series A-2 Certificate of Designation") as provided in Section XIV of these Bylaws. Each Director shall hold office until his/her successor shall have been elected and qualified.

**.03 Election.**

Between three and nine Directors shall be elected by the shareholders at their annual meeting each year, and other Directors can be elected pursuant to the Series A-1 & Series A-2 Certificate of Designation as provided in Section XIV of these Bylaws; and if, for any cause the Directors shall not have been elected at an annual meeting, they may be elected at a special meeting of shareholders called for that purpose in the manner provided by these Bylaws.

**.04 Vacancies.**

In case of any vacancy in the Board of Directors, the remaining Directors, whether constituting a quorum or not, may elect a successor to hold office for the unexpired portion of the terms of the Directors whose place shall be vacant, and until his/her successor shall have been duly elected and qualified. Further, the remaining Directors may fill any empty seats on the Board of Directors even if the empty seats have never been occupied. Notwithstanding the foregoing, vacancies of those additional Directors elected pursuant to the Series A-1& Series A-2 Certificate of Designation as provided in Section XIV of these Bylaws shall be filled by those holders of preferred stock entitled to elect said Directors under Section XIV of these Bylaws.

**.05 Resignation.**

Any Director may resign at any time by delivering written notice to the secretary of the Corporation.

**.06 Meetings.**

At any annual, special or regular meeting of the Board of Directors, any business may be transacted, and the Board may exercise all of its powers. Any such annual, special or regular meeting of the Board of Directors of the Corporation may be held outside of the State of Nevada, and any member or members of the Board of Directors of the Corporation may participate in any such meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time; the participation by such means shall constitute presence in person at such meeting.

*A. Annual Meeting of Directors.*

Annual meetings of the Board of Directors shall be held immediately after the annual shareholders' meeting or at such time and place as may be determined by the Directors. No notice of the annual meeting of the Board of Directors shall be necessary.

*B. Special Meetings.*

Special meetings of the Directors shall be called at any time and place upon the call of the president or any Director. Notice of the time and place of each special meeting shall be given by the secretary, or the persons calling the meeting, by mail, radio, telegram, or by personal communication by telephone or otherwise at least one (1) day in advance of the time of the meeting. The purpose of the meeting need not be given in the notice. Notice of any special meeting may be waived in writing or by telegram (either before or after such meeting) and will be waived by any Director in attendance at such meeting.

*C. Regular Meetings of Directors.*

Regular meetings of the Board of Directors shall be held at such place and on such day and hour as shall from time to time be fixed by resolution of the Board of Directors. No notice of regular meetings of the Board of Directors shall be necessary.

**.07 Quorum and Voting.**

A majority of the Directors presently in office shall constitute a quorum for all purposes, but a lesser number may adjourn any meeting, and the meeting may be held as adjourned without further notice. At each meeting of the Board at which a quorum is present, the act of a majority of the Directors present at the meeting shall be the act of the Board of Directors. The Directors present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Directors to leave less than a quorum.

**.08 Compensation.**

By resolution of the Board of Directors, the Directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as Director. No such payment shall preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

**.09 Presumption of Assent.**

A Director of the Corporation who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his/her dissent shall be entered in the minutes of the meeting or unless he/she shall file his/her written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favor of such action.

**.10 Chairman of Board of Directors.**

The Board of Directors may, in its discretion, elect a chairman of the Board of Directors from its members; and, if a chairman has been elected, he/she shall, when present, preside at all meetings of the Board of Directors and the shareholders and shall have such other powers as the Board may prescribe.

**.11 Removal.**

Directors may be removed from office with or without cause by a vote of shareholders holding a majority of the shares entitled to vote at an election of Directors.

**III.    ACTIONS BY WRITTEN CONSENT.**

**.01 Directors.**

Any corporate action required or permitted to be taken by the Articles of Incorporation, Bylaws, or the laws under which the Corporation is formed, at a meeting of the Board of Directors or of a committee thereof may be taken without a meeting if, before or after the action, a written consent thereto is signed by all the members of the Board of Directors or of the committee, except that such written consent is not required to be signed by:

(a) A common or interested Director who abstains in writing from providing consent to the action. If a common or interested Director abstains in writing from providing consent:

　　　(1) The fact of the common directorship, office or financial interest must be known to the Board of Directors or committee before a written consent is signed by all the members of the Board of Directors or the committee.

　　　(2) Such fact must be described in the written consent.

　　　(3) The Board of Directors or committee must approve, authorize or ratify the action in good faith by unanimous consent without counting the abstention of the common or interested Director.

(b) A Director who is a party to an action, suit or proceeding who abstains in writing from providing consent to the action of the Board of Directors or committee. If a Director who is a party to an action, suit or proceeding abstains in writing from providing consent on the basis that he or she is a party to an action, suit or proceeding, the Board of Directors or committee must:

　　　(1) Make a determination pursuant to NRS 78.751 that indemnification of the Director is proper under the circumstances.

(2) Approve, authorize or ratify the action of the Board of Directors or committee in good faith by unanimous consent without counting the abstention of the Director who is a party to an action, suit or proceeding.

**.02 Shareholders.**

Any corporate action required by the Articles of Incorporation, Bylaws, or the laws under which the Corporation is formed, to be voted upon or approved at a duly called meeting of the shareholders may be taken without a meeting if, before or after the action, a written consent thereto is signed by shareholders holding at least a majority of the voting power entitled to vote on such action, except that if a different proportion of voting power is required for such an action at a meeting, then that proportion of written consents is required.

IV.     **OFFICERS.**

**.01 Officers Designated.**

The Officers of the Corporation shall be a president, one or more vice presidents (the number thereof to be determined by the Board of Directors), a secretary and a treasurer, each of whom shall be elected by the Board of Directors. Such other Officers and assistant Officers as may be deemed necessary may be elected or appointed by the Board of Directors. Any Officer may be held by the same person, except that in the event that the Corporation shall have more than one Director, the offices of president and secretary shall be held by different persons.

**.02 Election, Qualification and Term of Office.**

Each of the Officers shall be elected by the Board of Directors. None of said Officers except the president need be a Director, but a vice president who is not a Director cannot succeed to or fill the office of president. The Officers shall be elected by the Board of Directors. Except as hereinafter provide, each of said Officers shall hold office from the date of his/her election until the next annual meeting of the Board of Directors and until his/her successor shall have been duly elected and qualified.

**.03 Powers and Duties.**

The powers and duties of the respective corporate Officers shall be as follows:

  *A. President.*

  The president shall be the chief executive Officer of the Corporation and, subject to the direction and control of the Board of Directors, shall have general charge and supervision over its property, business, and affairs. He/she shall, unless a Chairman of the Board of Directors has been elected and is present, preside at meetings of the shareholders and the Board of Directors.

  *B. Vice President.*

  In the absence of the president or his/her inability to act, the senior vice president shall act in his place and stead and shall have all the powers and authority of the president, except as limited by resolution of the Board of Directors.

*C. Secretary.*

The secretary shall:

1. Keep the minutes of the shareholder's and of the Board of Directors meetings in one or more books provided for that purpose;

2. See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

3. Be custodian of the corporate records and of the seal of the Corporation and affix the seal of the Corporation to all documents as may be required;

4. Keep a register of the post office address of each shareholder which shall be furnished to the secretary by such shareholder;

5. Sign with the president, or a vice president, certificates for shares of the Corporation, the issuance of which shall have been authorized by resolution of the Board of Directors;

6. Have general charge of the stock transfer books of the corporation; and,

7. In general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him/her by the president or by the Board of Directors.

*D. Treasurer.*

Subject to the direction and control of the Board of Directors, the treasurer shall have the custody, control and disposition of the funds and securities of the Corporation and shall account for the same; and, at the expiration of his/her term of office, he/she shall turn over to his/her successor all property of the Corporation in his/her possession.

*E. Assistant Secretaries and Assistant Treasurers.*

The assistant secretaries, when authorized by the Board of Directors, may sign with the president or a vice president, certificates for shares of the Corporation the issuance of which shall have been authorized by a resolution of the Board of Directors. The assistant treasurers shall, respectively, if required by the Board of Directors, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Board of Directors shall determine. The assistant secretaries and assistant treasurers, in general, shall perform such duties as shall be assigned to them by the secretary or the treasurer, respectively, or by the president or the Board of Directors.

**.04 Removal.**

The Board of Directors shall have the right to remove any Officer whenever in its judgment the best interest of the Corporation will be served thereby.

**.05 Vacancies.**

The Board of Directors shall fill any office which becomes vacant with a successor who shall hold office for the unexpired term and until his/her successor shall have been duly elected and qualified.

**.06 Salaries.**

The salaries of all Officers of the Corporation shall be fixed by the Board of Directors.

## V.   SHARE CERTIFICATES

### .01 Form and Execution of Certificates.

Certificates for shares of the Corporation shall be in such form as is consistent with the provisions of the corporation laws of the State of Nevada. They shall be signed by the president and by the secretary, and the seal of the Corporation shall be affixed thereto. Certificates may be issued for fractional shares.

### .02 Transfers.

Shares may be transferred by delivery of the certificates therefor, accompanied either by an assignment in writing on the back of the certificates or by a written power of attorney to assign and transfer the same signed by the record holder of the certificate. Except as otherwise specifically provided in these Bylaws, no shares shall be transferred on the books of the Corporation until the outstanding certificate therefor has been surrendered to the Corporation.

### .03 Loss or Destruction of Certificates.

In case of loss or destruction of any certificate of shares, another may be issued in its place upon proof of such loss or destruction and upon the giving of a satisfactory bond of indemnity to the Corporation. A new certificate may be issued without requiring any bond, when in the judgment of the Board of Directors it is proper to do so.

## VI.   BOOKS AND RECORDS.

### .01 Books of Accounts, Minutes and Share Register.

The Corporation shall keep complete books and records of accounts and minutes of the proceedings of the Board of Directors and shareholders and shall keep at its registered office, principal place of business, or at the office of its transfer agent or registrar a share register giving the names of the shareholders in alphabetical order and showing their respective addresses and the number of shares held by each.

### .02 Copies of Resolutions.

Any person dealing with the Corporation may rely upon a copy of any of the records of the proceedings, resolutions, or votes of the Board of Directors or shareholders, when certified by the president or secretary.

## VII.   LOANS.

No loans shall be made by the Corporation to its Officers or Directors

## VIII.   INDEMNIFICATION OF DIRECTORS AND OFFICERS.

### .01 Indemnification.

The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a Director, Trustee, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, Trustee, Officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgment, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The Corporation may not indemnify any such person if it is proven his act, or failure to act, constituted both a breach of his fiduciary duties as a director or officer, and his breach of those duties involved intentional misconduct, fraud or a knowing violation of law, making him liable pursuant to Section 78.138 of the Nevada Revised Statutes. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action proceeding, had reasonable cause to believe that such person's conduct was unlawful.

**.02 Derivative Action**

The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in the Corporation's favor by reason of the fact that such person is or was a Director, Trustee, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, Trustee, Officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees) and amount paid in settlement actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to amounts paid in settlement, the settlement of the suit or action was in the best interests of the Corporation; provided, however, that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for gross negligence or willful misconduct in the performance of such person's duty to the Corporation unless and only to the extent that, the court in which such action or suit was brought shall determine upon application that, despite circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as such court shall deem proper. The Corporation may not indemnify any such person if it is proven his act, or failure to act, constituted both a breach of his fiduciary duties as a director or officer, and his breach of those duties involved intentional misconduct, fraud or a knowing violation of law, making him liable pursuant to Section 78.138 of the Nevada Revised Statutes. The termination of any action or suit by judgment or settlement shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation.

**.03 Successful Defense.**

To the extent that a Director, Trustee, Officer, employee or Agent of the Corporation has been successful on the merits or otherwise, in whole or in part in defense of any action, suit or proceeding referred to in Paragraphs .01 and .02 above, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

**.04 Authorization.**

Any indemnification under Paragraphs ..01 and .02 above (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the Director, Trustee, Officer, employee or agent is proper in the circumstances because such person has met the applicable standard of conduct set forth in Paragraphs .01 and .02 above. Such determination shall be made (a) by the Board of Directors of the Corporation by a majority vote of a quorum consisting of Directors who were not parties to such action, suit or proceeding, or (b) is such a quorum is not obtainable, by a majority vote of the Directors who were not parties to such action, suit or proceeding, or (c) by independent legal counsel (selected by one or more of the Directors, whether or not a quorum and whether or not disinterested) in a written opinion, or (d) by the Shareholders. Anyone making such a determination under this Paragraph ..04 may determine that a person has met the standards therein set forth as to some claims, issues or matters but not as to others, and may reasonably prorate amounts to be paid as indemnification.

**.05 Advances.**

Expenses incurred in defending civil or criminal action, suit or proceeding shall be paid by the Corporation, at any time or from time to time in advance of the final disposition of such action, suit or proceeding as authorized in the manner provided in Paragraph .04 above upon receipt of an undertaking by or on behalf of the Director, Trustee, Officer, employee or agent to repay such amount if it is ultimately determined by a court of competent jurisdiction that such person is not entitled to be indemnified by the Corporation as authorized in this Section VIII or otherwise under applicable law.

**.06 Nonexclusivity**.

The indemnification provided in this Section VIII shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any law, bylaw, agreement, vote of shareholders or disinterested Directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Director, Trustee, Officer, employee or agent and shall inure to the benefit of the heirs, executors, and administrators of such a person.

**.07 Insurance.**

The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a Director, Trustee, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, Trustee, Officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against any liability assessed against such person in any such capacity or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability.

**.08 "Corporation" Defined.**

For purposes of this Section VIII, references to the "Corporation" shall include, in addition to the Corporation, an constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had the power and authority to indemnify its Directors, Trustees, Officers, employees or agents, so that any person who is or was a Director, Trustee, Officer, employee or agent of such constituent corporation or of any entity a majority of the voting stock of which is owned by such constituent corporation or is or was serving at the request of such constituent corporation as a Director, Trustee, Officer, employee or agent of the corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Section VIII with respect to the resulting or surviving Corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

## IX. AMENDMENT OF BYLAWS.

**.01 By the Shareholders.**

These Bylaws may be amended, altered, or repealed at any regular or special meeting of the shareholders if notice of the proposed alteration or amendment is contained in the notice of the meeting.

**.02 By the Board of Directors.**

These Bylaws may be amended, altered, or repealed by the affirmative vote of a majority of the entire Board of Directors at any regular or special meeting of the Board.

## X. FISCAL YEAR.

The fiscal year of the Corporation shall be set by resolution of the Board of Directors.

XI.        **RULES OF ORDER.**

       The rules contained in the most recent edition of Robert's Rules or Order, Newly Revised, shall govern all meetings of shareholders and Directors where those rules are not inconsistent with the Articles of Incorporation, Bylaws, or special rules or order of the Corporation.

XII.      **REIMBURSEMENT OF DISALLOWED EXPENSES.**

       If any salary, payment, reimbursement, employee fringe benefit, expense allowance payment, or other expense incurred by the Corporation for the benefit of an employee is disallowed in whole or in part as a deductible expense of the Corporation for Federal Income Tax purposes, the employee shall reimburse the Corporation, upon notice and demand, to the full extent of the disallowance. This legally enforceable obligation is in accordance with the provisions of Revenue Ruling 69-115, 1969-1 C.B. 50, and is for the purpose of entitling such employee to a business expense deduction for the taxable year in which the repayment is made to the Corporation. In this manner, the Corporation shall be protected from having to bear the entire burden of disallowed expense items.

XIII.     **FORUM AND FEE SHIFTING**

      **.01 Forum**

       Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of Chapter 78 or Chapter 92A of the Nevada Revised Statutes or the Articles of Incorporation or these By-Laws (in each case, as they may be amended from time to time), or (iv) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine shall be a state court located within the State of Nevada (or, if no state court located within the State of Nevada has jurisdiction, the federal district court for the District of Nevada).

      **.02 Fee Shifting**

      (a) In the event that, after the date of adoption of this Paragraph .02, (i) any current or former security holder of the Corporation, or anyone who holds a beneficial interest in any security of the Corporation (each, a "Claimant", each such Claimant, together with any other person who joins with the Claimant, offers substantial assistance to the Claimant, or has a direct financial interest in any Claim, being herein collectively referred to as the "Claiming Party") who initiates, asserts, maintains or continues any litigation, claim or counter-claim ("Claim") against the Corporation or against any current or former Director, Officer or security holder (including any Claim purportedly filed on behalf of or in the right of the Corporation or any security holder) arising in whole or in part out of any Internal Matter (as defined below), and (ii) the Claimant does not obtain a judgment on the merits with respect to such Claim that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the Corporation and any such current or former Director, Officer or security holder for all fees, costs, and expenses of every kind and description (including, but not limited to, all attorneys' fees and other litigation expenses) that the Corporation and any such current or former Director, Officer or security holder have incurred in connection with such Claim. For purposes of this Paragraph .02, the term "Internal Matter" shall mean and include: (i) any derivative action or proceeding brought on behalf of or in the right of the Corporation; (ii) any action asserting a claim of breach of a fiduciary duty owed by any Director, Officer or other employee of the Corporation to the Corporation or the Corporation's security holders; (iii) any action asserting a claim arising pursuant to any provision of applicable state law; (iv) any action asserting a claim arising pursuant to any provision of the federal securities laws, and any regulation promulgated pursuant thereto; or (v) any action asserting a claim governed by what is known as the internal affairs doctrine.

-10-

(b) Unless the Claimant holds five percent (5%) or more of the voting shares of the Corporation or hold voting trust certificates or a beneficial interest in shares representing five percent (5%) or more of the voting shares of the Corporation, the Corporation shall be entitled at any stage of the proceedings before final judgment to require the Claimant to provide surety for the expenses, including attorney's fees and other third party costs, which may be incurred by the Corporation in connection with such action and by the other parties defendant in connection therewith for which the Corporation may become liable. The Corporation may move the court having jurisdiction of such action for an order, upon notice and hearing, and the court shall determine the amount and form of surety the Claimant must post during the pendency of the action payable to the Corporation in such amount upon the termination of such action as the court deems appropriate. A ruling by the court on the motion shall not be a determination of any issue in the action or of the merits thereof. The amount of such security may thereafter from time to time be increased or decreased in the discretion of the court having jurisdiction of such action upon showing that the security provided has or may become inadequate or excessive. The Corporation shall have recourse to the posted surety in such amount as shall be determined by the court as and when the action is terminated. If the court, upon the motion, makes a determination that surety shall be posted by the Claimant, the action shall be dismissed unless the surety required by the court has been posted within such reasonable time as may be fixed by the court.

### XIV.    SPECIAL PROVISIONS

#### .01 Series A-1 Directors.

Notwithstanding any other provision of these Bylaws, as long as any shares of Series A-1 Preferred Stock remain outstanding under the Series A-1 & Series A-2 Certificate of Designation, the holders of a majority of the outstanding shares of Series A-1 Preferred Stock, voting as a separate class, shall pursuant to NRS 78.330 be entitled to elect two (2) Directors of the Corporation (the "Series A-1 Directors"), subject to the further rights of the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock as set forth in Section 6(b)(iv) of the Series A-1 & Series A-2 Certificate of Designation.

#### .02 Series A-2 Directors.

Notwithstanding any other provision of these Bylaws, as long as any shares of Series A-2 Preferred Stock remain outstanding under the Series A-1 & Series A-2 Certificate of Designation, the holders of a majority of the outstanding shares of Series A-2 Preferred Stock, voting as a separate class, shall pursuant to NRS 78.330 be entitled to elect the number of Directors of the Corporation equal to the difference (but not less than zero) of (x) two (2), minus (y) the number of Series A-1 Directors then able to be elected (the "Series A-2 Directors"). For the avoidance of doubt, if no Series A-1 Preferred Stock is then outstanding, the holders of the Series A-2 Preferred Stock shall be entitled to elect the Series A-2 Directors in accordance with the immediately preceding sentence.

#### .03 Additional Directors.

Notwithstanding any other provision of these Bylaws, if the Corporation incurs an Event of Default (as such term is defined in the Series A-1 & Series A-2 Certificate of Designation), then (x) the size of the Board shall automatically, without further notice, action or deed, increase from five (5) to seven (7), and (y) the holders of a majority of the then outstanding shares of Series A-1 Preferred Stock (or, if no Series A-1 Preferred Stock is then outstanding, then the holders of the Series A-2 Preferred Stock) shall have pursuant to NRS 78.330 the right to appoint two (2) additional Directors of the Corporation; provided, however, if such Event of Default is cured within six (6) months of the first occurrence thereof, then (x) the appointment of such additional Directors shall, without further notice, action or deed, terminate upon such cure, and (y) the size of the Board shall thereupon automatically, without further notice, action or deed, revert to five (5) upon such cure. The determination of whether any Event of Default has been cured shall be made by the then current Board.

**.04 Election of Directors.**

The holders of outstanding shares of Series A-2 Preferred Stock, Series B Preferred Stock and Common Stock, voting together as a single class, shall pursuant to NRS 78.330 be entitled to elect the number of Directors of the Corporation equal to five (5) less the number of Series A-1 Directors and Series A-2 Directors then able to be elected.

**.05 Change in Number of Directors.**

Notwithstanding any other provision of these Bylaws, but subject to Section 6(b)(iv) of the Series A-1 & Series A-2 Certificate of Designation, so long as any shares of Series A-1 Preferred Stock or any shares of Series A-2 Preferred Stock remain outstanding, without the prior affirmative vote or prior written consent of the Requisite Investors, (as such term is defined in the Series A-1 & Series A-2 Certificate of Designation), the Corporation shall not, directly or indirectly, or permit any of its Subsidiaries to, by amendment to the Corporation's Articles of Incorporation, bylaws or other governing documents, merger or otherwise, change the number of Directors which constitutes the Board of Directors.

# EXHIBIT B

Exhibit 10.44

**COMPARTMENT IT2, LP**
**COMPARTMENT IT5, LP**
**COMPARTMENT IT9, LP**

August 1, 2013

CIG Wireless Corp.
CIG Solutions, LLC
Communications Infrastructure Group, LLC
5 Concourse Parkway, Suite 3100
Atlanta, GA 30328

The Series A Investors party to the
Purchase Agreement referred to below

   RE:  <u>Acknowledgement and Consent – Financing Transaction</u>

Ladies and Gentlemen,

   The undersigned, COMPARTMENT IT2, LP, a Georgia Limited Partnership ("**Compartment IT2**"), by action of IAM US, LLC, a Delaware limited liability company, its General Partner (the "**General Partner**"); COMPARTMENT IT5, LP, a Georgia Limited Partnership ("**Compartment IT5**"), by action of the General Partner; COMPARTMENT IT9, LP, a Georgia Limited Partnership ("**Compartment IT9**"), by action of the General Partner; hereby duly execute and deliver this letter to Communications Infrastructure Group, LLC (the "**Company**"), CIG Solutions, LLC (the "**Manager**"), CIG Wireless Corp. (the "**Parent**") and the Series A Investors (as hereinafter defined) to confirm the respective understanding of each of Compartment IT2, Compartment IT5 and Compartment IT9 regarding the Financing Transaction (as hereinafter defined), with respect to the following:

   On or about the date hereof, the Parent is entering into a Securities Purchase Agreement, by and among the Parent, on the one hand, and each of the investors set forth on the signature pages affixed thereto (the "**Series A Investors**"), on the other hand (the "**Purchase Agreement**"), pursuant to which the Parent is issuing, on the date hereof, and, may issue in one or more closings, shares of the Parent's Series A-1 Non-Convertible Preferred Stock, par value $0.0001 per share ("**Series A-1 Preferred Stock**") and shares of the Parent's Series A-2 Convertible Preferred Stock, par value $0.0001 per share ("**Series A-2 Preferred Stock**") to the Series A Investors as described in the Purchase Agreement (the "**Financing Transaction**").

   Each of Compartment IT2, Compartment IT5 and Compartment IT9 hereby (a) consents to, ratifies, confirms, adopts and approves in all respects: (x) the Financing Transaction, and all related agreements to be executed in connection therewith, including, without limitation, the Purchase Agreement and the Certificate of Designation, Preferences and Rights of the Series A-1 Preferred Stock and Series A-2 Preferred Stock (collectively, the "**Financing Documents**"), and each of the transactions contemplated thereby, including, without limitation, the issuance of the Series A-1 Preferred Stock and Series A-2 Preferred Stock; and (y) any action relating to the subject matter of the foregoing taken by any of the officers, managers or members of the Company and the Parent prior to the date hereof, and (b) acknowledges and agrees that each of the Financing Documents, and the terms and conditions contained herein and therein, are fair and reasonable in all respects.

Each of Compartment IT2, Compartment IT5 and Compartment IT9 represents and warrants to the Company, the Parent and the Series A Investors, that, prior to the consummation of the Financing Transaction, such Party: (i) received and reviewed the Financing Documents; (ii) had a sufficient opportunity to review the Financing Documents in their entirety; (iii) had a sufficient opportunity to consult with its financial, tax and other advisors regarding the Financing Documents; and (iv) had a sufficient opportunity to ask questions of the Company and the Parent regarding the Financing Documents and the Financing Transaction. Each of Compartment IT2, Compartment IT5 and Compartment IT9 further acknowledges that all information that such party has requested from the Company and/or the Parent and all questions that such Party has made to the Company and/or the Parent, if applicable, with regard to the Financing Documents or the Financing Transaction has been fully and satisfactorily provided or answered by the Company and/or the Parent. Each of Compartment IT2, Compartment IT5 and Compartment IT9 acknowledges that it has consulted, to the extent it has desired to do so, with its own independent counsel in connection with the Financing Transaction and the matters contemplated thereby

Each of Compartment IT2, Compartment IT5 and Compartment IT9 acknowledges that this letter is being delivered in order to induce the Series A Investors to consummate the Financing Transaction. Each of Compartment IT2, Compartment IT5 and Compartment IT9 represents and warrants that it has full power and authority to execute and deliver this letter and understands that the Series A Investors are relying upon this letter in consummating the Financing Transaction.

This letter and the consent and acknowledgment contained herein shall constitute an estoppel by each of Compartment IT2, Compartment IT5, Compartment IT9 and the General Partner for the benefit of the Company, the Manager, the Parent and the Series A Investors, which may not be revoked at any time for any reason and which may be fully relied upon without exceptions or qualifications by each of the Company, the Manager, the Parent and the Series A Investors. This letter has been drafted jointly by Compartment IT2, Compartment IT5 and Compartment IT9 together with the Company, the Manager, the Parent and the Series A Investors, and in the event of any ambiguity nothing herein shall be construed against the Company, the Manager, the Parent or the Series A Investors as the draftsperson.

Each Series A Investor is an unqualified, express intended third party beneficiary of this letter and shall have the right to assert and enforce the provisions of this letter directly against Compartment IT2, Compartment IT5 or Compartment IT9 directly on its own behalf.

This letter shall be binding on each of Compartment IT2's, Compartment IT5's and Compartment IT9's successors and permitted assigns. This letter shall be governed by the laws of the State of New York, without regard to its conflicts of law rules, and all actions to interpret or enforce this letter shall only be brought in the state and federal courts located in New York County, New York. This letter may be executed in one or more counterparts, which shall be deemed one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, this letter has been duly executed by each of the parties set forth below as of the date first above set forth.

**CLASS A-IT2 MEMBER: COMPARTMENT IT2, LP**

   BY: IAM US, LLC
     General Partner

     BY: MfAM Mobilfunk Asset Management GmbH
       Managing Director

       BY: /s/ Stephan Brückl
         Name: Stephan Brückl
         Title:  Managing Director

**CLASS A-IT5 MEMBER: COMPARTMENT IT5, LP**

   BY: IAM US, LLC
     General Partner

     BY: MfAM Mobilfunk Asset Management GmbH
       Managing Director

       BY: /s/ Stephan Brückl
         Name: Stephan Brückl
         Title:  Managing Director

**CLASS A-IT9 MEMBER: COMPARTMENT IT9, LP**

   BY: IAM US, LLC
     General Partner

     BY: MfAM Mobilfunk Asset Management GmbH
       Managing Director

       BY: /s/ Stephan Brückl
         Name: Stephan Brückl
         Title:  Managing Director

# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

COMPARTMENT IT2, LP, a Georgia
limited partnership, COMPARTMENT IT5,
LP, a Georgia limited partnership,
COMPARTMENT IT9, LP, a Georgia
limited partnership, and MFAM
MOBILFUNK ASSET MANAGEMENT
GMBH, a German corporation,

                              Plaintiffs,

        v.

FIR TREE, INC. d/b/a FIR TREE
PARTNERS, PAUL MCGINN, GABRIEL
MARGENT, GRANT BARBER, JARRET
COHEN, and SCOTT TROELLER,

                              Defendants.

Case No. 2:17-cv-01035-MMD-VCF

ORDER

## I.    SUMMARY

Before the Court are three motions: (1) Defendant Paul McGinn's Motion to Dismiss (ECF No. 9); (2) Defendants Jarret Cohen, Fir Tree, Inc. ("Fir Tree"), and Scott Troeller's Motion to Dismiss (ECF No. 12); and (3) Defendants Gabriel Margent and Grant Barber's Motion to Dismiss (ECF No. 16). Plaintiffs Compartments IT2, IT5, and IT9, LP ("IT Funds"), together with MFAM Mobilfunk Asset Management GmbH (collectively, "Plaintiffs") filed one consolidated response (ECF No. 42), and Defendants replied (ECF Nos. 49, 50, 53). The Court held a hearing on the motions on March 26, 2018. (ECF No. 56.) For the following reasons, the Court grants Defendants' motions to dismiss.

## II.    BACKGROUND

The following facts are taken from the Complaint unless otherwise indicated. CIG Wireless, Inc. ("CIG") was a corporation whose business consisted primarily of leasing

antenna space to wireless service providers on its network of communications towers. (ECF No. 1 at 6.) Defendant Fir Tree was CIG's controlling shareholder by virtue of the large quantity of preferred stock it held, preferred stock that entitled it to first cut of the proceeds from any liquidation of CIG. Plaintiffs were CIG's minority shareholders and held only common stock. Plaintiffs allege that Fir Tree engaged in a course of conduct that caused the value of the common stock to plummet while leaving the value of the preferred stock intact, ultimately forcing a merger that left Fir Tree flush with cash and Plaintiffs virtually empty-handed. Plaintiffs further allege that the directors of CIG—Cohen, Troeller, Margent, Barber, and McGinn ("Director Defendants")—functioned as Fir Tree's puppets, carrying out Fir Tree's aim of concentrating the equity value of CIG in the preferred stock.

### A. Financing Agreements

Plaintiffs IT Funds and Defendant Fir Tree both ended up as CIG shareholders, but only Fir Tree started out that way. The IT Funds began their relationship with CIG as creditors. (*Id.* at 7.) Eventually, the IT Funds' confidence in CIG grew, and the IT Funds agreed to convert certain loans they had made to CIG into shares of CIG common stock. (*Id.*) Although the IT Funds and CIG executed this financing agreement in 2012, the loans did not actually convert until 2014 and 2015. (*Id.*)

While the IT Funds were still creditors, CIG obtained financing from Defendant Fir Tree consisting of a $35 million infusion with the right to call additional financing of up to $25 million. (*Id.* at 8-9.) In exchange for the $35 million infusion, Fir Tree received the right to designate two board members, veto power over certain business decisions, and two kinds of preferred stock (Series A-1 Preferred Stock and Series A-2 Preferred Stock). (*Id.* at 9-11.) Once Fir Tree received the preferred stock (of which Series A-2 conferred voting rights), Fir Tree controlled about 48.8% of CIG's voting stock. (*Id.* at 9.)

The financing was governed by a contract ("Fir Tree Financing Agreement"). The Fir Tree Financing Agreement established that both kinds of preferred stock were entitled to liquidation premiums and anti-dilution protection. (*Id.*) The Fir Tree Financing Agreement also established priorities among CIG's equity holders in the event of

1    liquidation: Series A-1 Preferred Stock would receive payment first, and any surplus would

2    flow to Series A-2 Preferred Stock then to Series B followed by common stock. (ECF No.

3    12 at 6.)

4           Plaintiffs do not dispute that they executed an "Acknowledgement and Consent" to

5    the Fir Tree Financing Agreement. (*See* ECF No. 42 at 19; *see also* ECF No. 14 at 42-

6    44.)

7           **B.    Fir Tree Becomes Majority Shareholder**

8           CIG called on additional financing from Fir Tree twice, for a total of $9 million. (ECF

9    No. 1 at 11.) When the first call closed on December 18, 2013, Fir Tree received sufficient

10   shares of preferred stock to make it the majority shareholder of CIG, and the value of the

11   common stock dropped to about $1.50 per share. (*Id.* at 11-12.) When the second call

12   closed on March 7, 2014, Fir Tree held approximately fifty-six percent of the outstanding

13   voting stock of CIG. (*Id.* at 12.) The common stock's value then fell further, to $1.25 per

14   share. (*Id.*) Plaintiffs allege that the share price of the common stock fell because the

15   common stock was diluted and placed under Fir Tree's growing liquidation preference.

16   (*Id.*)

17          **C.    Loan Conversion**

18          The IT Funds' interests converted into shares of common stock on December 31,

19   2014, and March 31, 2015. (*Id.* at 17.) These conversions triggered the anti-dilution

20   protections of Fir Tree's preferred stock, but the corporate charter and certificate of

21   designation did not authorize enough shares to carry out the anti-dilution protection. (*Id.*)

22   The Director Defendants amended the charter and certificate of designation to authorize

23   more shares, and Fir Tree received voting shares sufficient to obtain sixty percent voting

24   power. (*Id.* at 17-18.)

25          **D.    Alleged Mismanagement**

26          CIG allegedly went into "sleep mode" after accepting Fir Tree's financing. (*Id.* at 11-

27   12.) CIG acquired towers at a slower rate, issued fewer press releases than it had prior to

28   the Fir Tree financing, and abandoned efforts to list CIG's common stock on a U.S.

                                           3

1   national exchange. (*Id.* at 11, 13.) The value of CIG's common stock dropped significantly

2   as a result of Fir Tree's alleged dilution and expanding liquidation preference. (*Id.* at 13.)

3   The share price of the common stock dropped to $0.28 by December 31, 2014. (*Id.*)

4       CIG also established an incentive plan for its executives. (*Id.* at 14-15.) Under the

5   incentive plan, the Compensation Committee approved grants of about seven million

6   restricted shares to certain directors that would only vest if Fir Tree obtained liquidity for

7   its investment. (*Id.* at 15; ECF No. 12 at 7.) The shares had the same voting rights as

8   common stock, but Fir Tree held the voting authority by proxy. (ECF No. 1 at 16.)

9   Defendant McGinn received most of the shares (5,561,866). (*Id.* at 15.) Defendants Barber

10  and Margent each received 166,856 shares, and CIG's Chief Financial Officer and

11  Treasurer (a non-party) received 556,187 shares. (*Id.*)

12      **E.   Merger**

13      CIG announced its entry into a merger agreement with Vertical Bridge on March

14  20, 2015, causing the value of the common stock to drop to $0.02 per share. (*Id.* at 13,

15  18.) Under the terms of the merger agreement, Fir Tree would receive $90 million in cash,

16  and the entire pool of common stock and Series B shares would split $1.75 million in cash,

17  but only if they agreed to release Fir Tree and the Director Defendants from liability. (*Id.*)

18  Plaintiffs refused the cash. (ECF No. 16 at 12.)

19      After announcing the merger, CIG appointed a Special Committee. (ECF No. 1 at

20  19.) Defendants Barber and Margent were the only members, and they received $10,000

21  per month for serving on the committee. (*Id.* at 19-20.) The Special Committee approved

22  the merger with Vertical Bridge on March 19, 2015. (*Id.* at 22.) The terms of the Merger

23  Agreement and related agreements were finalized and executed on March 20, 2015, after

24  Fir Tree, wielding sixty-two percent of the shareholder vote, approved the Merger. (*Id.*)

25  **III.   LEGAL STANDARD**

26      A court may dismiss a plaintiff's complaint for "failure to state a claim upon which

27  relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "a

28  short and plain statement of the claim showing that the pleader is entitled to relief." Fed.

4

R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678. Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged–but not shown–that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570.

A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. at 562 (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989) (emphasis in original)).

## IV. DISCUSSION

Defendants assert the threshold argument that Plaintiffs have failed to comply with Rule 23.1 of the Federal Rules of Civil Procedure regarding shareholder derivative suits.

5

(ECF No. 9 at 15; ECF No. 12 at 10-11; ECF No. 16 at 15.) Plaintiffs counter that the requirements of Rule 23.1 do not apply because their claims are either purely direct or otherwise dual direct and derivative. (ECF No. 42 at 12-13.) The Court agrees with Defendants that Plaintiffs' allegations either do not give rise to plausible direct claims or any plausible direct claims fall within the terms of the Financing Agreement.

Rule 23.1 applies to shareholder derivative suits and provides that a shareholder must either demand action from the corporation's directors before filing suit or plead with particularity the reasons why such demand would have been futile. *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014). The requirements of Rule 23.1 do not apply to direct claims. Whether a claim is direct or derivative in nature turns on the following questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Ace Am. Ins. Co. v. Hallier*, No. 2:14-cv-00703-APG-NJK, 2015 WL 1326499, at *2 (D. Nev. Mar. 25, 2015); *see also Parametric Sound Corp. v. Eighth Judicial Dist. Court in & for Cty. of Clark*, 401 P.3d 1100, 1108 (Nev. 2017). "The court must 'independently examine the nature of the wrong alleged and any potential relief to make its own determination' regarding the nature of the claims." *Halpert v. Zhang*, No. CV 12-1339-SLR-SRF, 2015 WL 1530819, at *2 (D. Del. Apr. 1, 2015), *report and recommendation adopted*, No. CV 12-1339-SLR, 2015 WL 1869755 (D. Del. Apr. 21, 2015) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004)).[1]

///

///

---

[1] The Court looks to Delaware case law to forecast how the Nevada Supreme Court would resolve the issue where Nevada precedent is not on point. *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008) ("Where there is no Nevada precedent on point this Court must predict how the Nevada Supreme Court would decide the question. Because the Nevada Supreme Court frequently looks to the Delaware Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of corporation law, this Court often looks to those sources to predict how the Nevada Supreme Court would decide the question.").

### A.    Whether Plaintiffs' Claims Are Direct

Plaintiffs argue that their claims are direct based on their allegation that the value of their common stock decreased while "the overall value of [CIG] as a company remained [and] Fir Tree's interest increased." (ECF No. 42 at 13.) While this allegation might demonstrate direct harm if examined in isolation, the factual allegations that support this conclusion do not demonstrate direct harm. Throughout the Complaint, Plaintiffs attribute the loss in value of their common stock to four kinds of action taken by Defendants: putting CIG into sleep mode, awarding improper executive compensation packages to the Director Defendants, failing to take proper steps to approve the merger, and over-issuing preferred stock to Fir Tree. None of these actions give rise to direct claims as pleaded.

### 1.    Sleep Mode

Plaintiffs' allegations that Defendants put CIG into sleep mode give rise to derivative claims because Defendants' conduct would have hurt the company itself. "[A] claim of direct injury 'must be independent of any alleged injury to the corporation.'" *Halpert*, 2015 WL 1530819, at *2 (quoting *Tooley*, 845 A.2d at 1039). While Plaintiffs allege that CIG did not suffer any injury—that its value "remained"—these allegations are contradicted by Plaintiffs' allegations that Defendants slowed CIG's tower acquisition and media engagement to a crawl. (ECF No. 1 at 11-13.) It seems implausible that this course of conduct would not harm the corporation itself despite Plaintiffs' insistence that CIG was not harmed. (ECF No. 1 at 13; ECF No. 42 at 12-13.) Thus, accepting Plaintiffs' allegations as true, Plaintiffs cannot state a plausible direct claim based on the contradictory and conclusory allegation that CIG's value was not impaired relative to what it would have been if CIG were aggressively acquiring towers and engaging with the media to promote the company.

### 2.    Executive Compensation

Plaintiffs' allegations regarding improper executive compensation either give rise to derivative claims or are too attenuated from Plaintiffs' alleged direct harm to ground direct claims. Plaintiffs allege that Defendants breached their fiduciary duties by directing or

authorizing the award of certain executive compensation: cash bonuses and grants of restricted stock to Defendants McGinn, Barber, and Margent. (*See* ECF No. 1 at 25; ECF No. 42 at 38-45.)

Allegations regarding the cash bonuses amount to allegations of excessive executive compensation. Such allegations give rise to derivative claims because excessive compensation harms the corporation. *See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (finding that claims related to purportedly excessive executive compensation were derivative).

Plaintiffs' allegations regarding the restricted shares are too attenuated from Plaintiffs' alleged direct harm to ground direct claims. Plaintiffs allege that the grant of restricted shares had two effects: aligning McGinn, Barber, and Margent's interest with Fir Tree's and diluting Plaintiffs' voting power. (ECF No. 42 at 40, 43.) However, Plaintiffs do not explain how either of these caused the alleged shift in equity of Plaintiffs' common stock to the preferred stock to state a plausible direct claim. In addition, Defendants contend that the restricted stock actually aligned their interests with the common shareholders like Plaintiffs because the restricted shares—just like the common shares— were subordinate to the preferred shares in the event of liquidation. (*See, e.g.*, ECF No. 12 at 19.) Without additional factual allegations, the Court does not find it plausible that the award of restricted stock itself caused the value of Plaintiffs' common shares to shift to Fir Tree thereby harming only Plaintiffs as holders of the common stock.

### 3. Merger and Pre-Merger Activities

Plaintiffs allegations related to the merger are also too attenuated from Plaintiffs' alleged direct harm to ground direct claims. Plaintiffs allege that the CIG Special Committee was not properly formed and did not function properly, that the merger was not conditioned on a majority-of-the-minority vote, and that the interests of the controller and the minority diverged. (ECF No. 42 at 28.) However, Plaintiffs do not allege how these actions caused the value of Plaintiffs' common shares to shift to Fir Tree or caused harm ///

to Plaintiffs but not CIG. Thus, the Court cannot find that these allegations plausibly give rise to direct claims.

### 4.    Issuance of Preferred Stock

Plaintiffs' allegation of direct harm stemming from the issuance of preferred stock to Fir Tree does not give rise to direct claims because Plaintiffs are estopped from asserting such claims by their consent to the Fir Tree Financing Agreement. Plaintiffs allege that the value of their shares dropped because Fir Tree caused CIG to issue more and more preferred stock. (*Id.* at 11-12.) Specifically, Plaintiffs allege that Fir Tree received CIG stock in exchange for capital infusions, in lieu of dividends, and in connection with its anti-dilution protections. (ECF No. 1 at 8-9, 17.) But these issuances were permitted by the Fir Tree Financing Agreement Plaintiffs ratified and cannot form the basis of Plaintiffs' claims. *See Carstarphen v. Milsner*, No. 3:07-cv-00542-ECR-RAM, 2011 WL 4916620, at *7 (D. Nev. Oct. 14, 2011) (finding that shareholder was estopped from challenging board actions to which he consented). Thus, to the extent Plaintiffs might demonstrate an independent harm giving rise to direct claims, they have not done so here because of the terms of the Financing Agreement.

### B.    Whether Plaintiffs' Claims Are Dual Direct and Derivative

Plaintiffs further argue that their allegations give rise to dual direct and derivative claims. (ECF No. 42 at 13.) While "the same set of facts may inflict both derivative and direct harm on a shareholder, generating both a direct claim and a derivative claim," this is an exception to the general rule that allegations of corporate mismanagement resulting in depressed share prices give rise to derivative actions. *See Halpert*, 2015 WL 1530819, at *2 (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)). "A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the ///

1    controlling stockholder, and a corresponding decrease in the share percentage owned by

2    the public (minority) shareholders." *Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del. 2006).

3        Plaintiffs' allegations do not give rise to dual direct and derivative claims because

4    the allegations do not show that the shares Fir Tree received were excessive. Plaintiffs

5    allege that Fir Tree received CIG stock in exchange for capital infusions, in lieu of

6    dividends, and in connection with its anti-dilution protections. (ECF No. 1 at 8-9, 17.) But

7    these issuances were permitted by the Fir Tree Financing Agreement Plaintiffs ratified.

8    Plaintiffs argue that extra-contractual conduct led to excessive issuances, but the only

9    plausibly extra-contractual conduct related to share issuance that Plaintiffs allege is the

10   amendment of the corporate charter and certificate of designation to authorize more

11   shares. (ECF No. 42 at 14.) While the Fir Tree Financing Agreement did not specifically

12   contemplate charter amendment, amending the charter became necessary to honor the

13   Fir Tree Financing Agreement. If the anti-dilution protection required the issuance of more

14   stock than was authorized, then the charter or certificate of designation would need to be

15   amended to issue more stock.

16       Because Plaintiffs' claims are neither direct nor dual direct and derivative, the Court

17   will dismiss Plaintiffs' Complaint for failure to comply with Rule 23.1.

18   **V.    CONCLUSION**

19       The Court notes that the parties made several arguments and cited to several cases

20   not discussed above. The Court has reviewed these arguments and cases and determines

21   that they do not warrant discussion as they do not affect the outcome of the motions before

22   the Court.

23       It is therefore ordered that Defendant Paul McGinn's Motion to Dismiss (ECF No.

24   9) is granted.

25       It is further ordered that Defendants Jarret Cohen, Fir Tree, and Scott Troeller's

26   Motion to Dismiss (ECF No. 12) is granted.

27       It is further ordered that Defendants Gabriel Margent and Grant Barber's Motion to

28   Dismiss (ECF No. 16) is granted.

10

1    It is further ordered that Plaintiffs' Complaint (ECF No. 1) is dismissed without

2 prejudice.

3    The Clerk is directed to enter judgment in accordance with this Order and close this

4 case.

5    DATED THIS 30th day of March 2018.

6

7    _____

8    MIRANDA M. DU
     UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11